**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MELANIE WOHL, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 23-4770 ) |
| | ) **JURY TRIAL DEMANDED** |
| ENZO BIOCHEM, INC. and ENZO CLINICAL LABS, INC., | ) ) ) |
| Defendants. | ) ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Melanie Wohl ("Plaintiff") brings this Class Action Complaint on behalf of herself, and all others similarly situated, against Defendants Enzo Biochem, Inc. ("Enzo Biochem") and Enzo Clinical Labs, Inc. ("Enzo Clinical Labs") (collectively, "Enzo" or "Defendants"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

**NATURE OF THE ACTION**

1.    Healthcare providers that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2.    The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending

1

risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3.     Enzo operates a full-service clinical laboratory and is one of the leading regional clinical labs in the country, providing diagnostic testing services.

4.     As a healthcare provider, Enzo knowingly collects and stores a litany of highly sensitive PII and PHI from its patients. In turn, Enzo has a resulting duty to secure, maintain, protect, and safeguard the PII and PHI that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

5.     Enzo expressly recognizes its duty to securely maintain patients' PII and PHI in confidence. Enzo's HIPAA Notice states that Enzo "understands that your medical information is private and confidential" and further explains that Enzo is "required by law to maintain the privacy of 'protected health information'" which includes "any individually identifiable information that [Enzo] obtain[s] from you or others that related to your past, present or future physical or mental health, the health care you have received, or payment for your healthcare."[1]

6.     Despite Enzo's duty to safeguard its patients' PII and PHI, Plaintiff's and Class Members' PII and PHI was accessed and exfiltrated by an unknown third party who gained access to Defendants' computer systems between April 4 and April 6, 2023 (the "Data Breach").[2]

---

[1] *HIPAA Policy*, Enzo Clinical Labs, https://www.enzoclinicallabs.com/footer-links/hipaa-policy (last visited June 16, 2023).

[2] Carly Page, *Enzo Biochem says ransomware attack exposed clinical test data of 2.5 million patients*, TechCrunch (June 1, 2023), *Notice of Data Security Event*, Enzo Clinical Labs, https://techcrunch.com/2023/06/01/enzo-biochem-says-ransomware-attack-exposed-clinical-test-data-of-2-5-million-patients/;    https://www.enzoclinicallabs.com/Uploaded/Website-Notice.pdf (last visited June 16, 2023) ("Notice of Data Breach").

7.      Based on the public statements of Enzo to date, a wide variety of PII and PHI was implicated in the Data Breach, including, but not limited to, patient names, dates of service, clinical test information, and Social Security Numbers.[3]

8.      As a direct and proximate result of Defendants' inadequate data security measures, and its breach of their duty to handle patient PII and PHI with reasonable care, Plaintiff's and Class Members' PII and PHI have been accessed by hackers and exposed to an untold number of unauthorized individuals.

9.      Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10.     Plaintiff, on behalf of herself, and the Class as defined herein, brings claim for negligence, negligence *per se*, breach of an implied contract, unjust enrichment, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

## **PARTIES**

11.     Plaintiff Melanie Wohl is an adult, who at all relevant times, is and was a resident and citizen of the State of New York. Plaintiff was a patient of Enzo. Plaintiff received a Data Breach notice from Enzo Clinical Labs informing her that her PII and PHI she entrusted to Enzo was compromised in the Data Breach.

---

[3] Notice of Data Breach, *supra* note 2.

12.     Since the announcement of the Data Breach, Plaintiff has received a significant increase in spam calls compared to prior to the Data Breach. Plaintiff has further suffered emotional distress as a result of her PII and PHI being accessed and exposed to an unauthorized third-party.

13.     As a result of the Data Breach, Plaintiff will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

14.     Defendant Enzo Biochem is a New York corporation with a principal place of business located at 81 Executive Boulevard, Suite, 3, Farmingdale, New York 11735. Defendant Enzo Biochem is the parent company of Defendant Enzo Clinical Labs.

15.     Defendant Enzo Clinical Labs is a New York corporation with a principal place of business located at 81 Executive Boulevard, Suite, 3, Farmingdale, New York 11735. Defendant Enzo Clinical Labs is a wholly owned subsidiary of Enzo Biochem.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendants.

17.     This Court has personal jurisdiction over Defendants because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendants reside in this District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendants reside in this District.

## FACTUAL BACKGROUND

**A.     Enzo Collected and Stored Plaintiff's and Class Members' PII and PHI.**

19.     Enzo Biochem is a life sciences and biotechnology company that performs research and provides diagnostic services and treatments for cancer, metabolic, and infectious diseases. Enzo also provides testing services for COVID-19, genetic conditions, and sexually transmitted diseases.

20.     Enzo Biochem operates through three wholly owned subsidiaries, one of which is Enzo Clinical labs, a clinical testing laboratory, meaning that through the operation of their clinical lab, Defendants have a direct patient relationship with Plaintiff and Class Members.

21.     As a condition of providing their clinical laboratory services to Plaintiff and Class Members, Defendants receive, create, and handle PII and PHI, which includes, *inter alia*, patient names, dates of service, clinical test information, and Social Security numbers.

22.     Plaintiff and Class Members directly or indirectly entrusted Enzo with their sensitive and confidential PII and PHI and therefore reasonably expected that Defendants would safeguard their highly sensitive PII and keep their PHI confidential.

23.     By obtaining, collecting, and storing Plaintiff's and Class Members' PII and PHI, Enzo assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

24.     Despite these duties, Enzo failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI, and ultimately allowed nefarious third-party hackers to breach Defendants' computer systems, compromising Plaintiff's and Class Members' PII and PHI stored therein.

**B.      Enzo Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Risk of Harm to Victims.**

25.     Enzo was well aware that the PHI and PII it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

26.     Enzo also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

27.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

28.     PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[4] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

29.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[5]

---

[4] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[5]*Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

30.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[6]

31.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[7] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[8]

32.     Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[9]

33.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure

---

[6] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited June 16, 2023).

[7] *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited June 16, 2023).

[8] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text= Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.

[9] *Id.*

or unauthorized disclosure of the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[10]

34.    Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[11]

35.    In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[12]

36.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[13]

37.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Enzo's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

---

[10] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited June 16, 2023).

[11] *Id.*

[12] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last visited June 16, 2023).

[13] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

38.    **Social Security numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

39.    The Social Security Administration even warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[14]

40.    Social security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for

---

[14] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

41.     **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[15] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[16]

42.     Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[17]

43.     "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any

---

[15] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.
[16] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited June 16, 2023).
[17] Alder, *supra* note 8.

malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[18]

44.     According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[19]

45.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[20]

46.     Based on the value of its patients' PII and PHI to cybercriminals, Enzo knew or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the

---

[18] *Id.*
[19] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.
[20] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited June 16, 2023).

foreseeable consequences if its data security systems were breached. Enzo failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**C.      Enzo Breached its Duty to Protect Patient PII and PHI.**

47.      On or about April 6, 2023, Enzo reported to the Securities and Exchange Commission that is at experienced a ransomware attack that impacted certain information technology systems.[21]

48.      According to Enzo, the Data Breach occurred between April 4 and April 6, 2023.[22]

49.      In response to the Data Breach, Enzo took its information systems offline, engaged third party experts, and launched an investigation into the Data Breach.[23]

50.      On or about April 11, 2023, the investigation revealed that during the Data Breach the threat actor gained unauthorized access to, and exfiltrated, certain information from Enzo's information technology systems.[24]

51.      The investigation further revealed that the information comprised during the data breach includes, *inter alia*, patient names, dates of service, clinical test information, and Social Security Numbers.[25]

52.      On or around June 6, 2023, Enzo notified the U.S. Department of Health and Human Services, Office for Civil Rights ("HHS") of the Data Breach, indicating that the Data Breach impacted approximately 2,470,000 patients.[26]

---

[21] *Enzo Biochem, Inc. Form 8-k* (Apr. 6, 2023).
[22] Notice of Data Breach, *supra* note 2.
[23] *Enzo Biochem, Inc. Form 8-k*, *supra* note 21.
[24] *Id.*
[25] Notice of Data Breach, *supra* note 2.
[26] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Department of Health & Human Services Office for Civil Rights, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 16, 2023).

53.    Of those 2,470,000 patients whose clinical test information was compromised during the Data Breach, Enzo has confirmed that the Social Security Numbers of approximately 600,000 of those patients was also compromised during the Data Breach.[27]

54.    On or around the same time that Enzo reported the Data Breach to HHS, Plaintiff received a Data Breach Notice from Enzo Clinical Labs indicating that her PII and PHI had been compromised in the Data Breach.

55.    Upon information and belief, Class Members received similar Data Breach notices from Enzo Clinical Labs indicating that their PII and PHI had been compromised in the Data Breach.

56.    The Data Breach is the direct and proximate result of Enzo's failure to implement reasonable data security measures.

**D.    Enzo Is Obligated Under HIPAA To Safeguard Patient PHI.**

57.    Defendants are required by the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq*. ("HIPAA") to safeguard patient PHI.

58.    Defendants are entities covered by HIPAA, which sets minimum federal standards for privacy and security of PHI.

59.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

60.    Under 45 C.F.R. §160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media"; "[m]aintained in electronic media"; or "[t]ransmitted or maintained in any other form or medium."

---

[27] *Enzo Biochem, Inc. Form 8-k*, *supra* note 21.

61.     Under 45 C.F.R. §160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual"; or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

62.     HIPAA requires Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

63.     While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

64.     As such, Defendants are required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that they acquire, receive, and collect, and Defendants are further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

65.     Given the application of HIPAA to Enzo, and that Plaintiff and Class Members entrusted their PHI to Defendants in order to receive medical treatment, Plaintiff and Class

14

Members reasonably expected that Defendants would safeguard their highly sensitive information and keep their PHI confidential.

**E.    FTC Guidelines Prohibit Enzo from Engaging in Unfair or Deceptive Acts or Practices.**

66.    Defendants are prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

67.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[28]

68.    The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[29]

69.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

---

[28] *Start with Security – A Guide for Business*, U.S. FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf    (last visited on June 16, 2023).

[29] *Protecting Personal Information: A Guide for Business*, U.S. FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on June 16, 2023).

on the network; and verify that third-party service providers have implemented reasonable security measures.[30]

70.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

71.     Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

72.     Defendants were at all times fully aware of their obligations to protect the PII and PHI of patients because of their position as a healthcare provider, which gave Defendants direct access to reams of patient PII and PHI. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**F.     Plaintiff and Class Members Suffered Damages.**

73.     For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff, and members of the Class, significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4)

---

[30] *Id.*

search for suitable identity theft protection and credit monitoring services, and pay to procure them.

74.    Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

75.    As a result of Defendants' failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PHI.

76.    From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[31]

77.    With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[32]

78.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's

---

[31] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4 (Mar. 7, 2023), https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

[32] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTH IT SEC. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[33]

79.     The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[34]

80.     Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[35]

81.     "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[36]

82.     Plaintiff and Class Members are also at a continued risk because their information remains in Enzo's information systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

83.     Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

---

[33] *Id*.

[34] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[35] *Id*.

[36] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited June 16, 2023).

## CLASS ALLEGATIONS

84.    Plaintiff brings this class action on behalf of herself, and all other individuals who are similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

85.    Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States and its territories whose PII and/or PHI was compromised in the Enzo Data Breach which occurred between April 4 and April 6, 2023 (the "Class").

86.    Excluded from the Class are Defendants, their subsidiaries and affiliates, officers and directors, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

87.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

88.    **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Enzo's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 2,470,000 million individuals.

89.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

      a.    Whether Defendants had a duty to protect the PII and PHI of Plaintiff and Class Members;

b.  Whether Defendants were negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached their duties thereby;

c.  Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

d.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct.

90.  **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all patients of Defendants, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

91.  **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

92.  **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, expense, and promote uniform decision-making.

93.  **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached their duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

94.  **Injunctive Relief:** Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23(b)(2).

95.  **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendants' books and records.

<u>**FIRST CAUSE OF ACTION**</u>
**NEGLIGENCE**
**(Against All Defendants)**
**(Plaintiff on Behalf of the Class)**

96.  Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

97.  Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

98.  Enzo's duty to use reasonable care arose from several sources, including but not limited to those described below.

99.    Defendants have a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By receiving, maintaining, and handling PII and PHI that is routinely targeted by criminals for unauthorized access, Enzo was obligated to act with reasonable care to protect against these foreseeable threats.

100.    Enzo's duty also arose from Defendants' position as healthcare providers. Defendants hold themselves out as trusted providers clinical lab testing services, thereby assuming a duty to reasonably protect the information they obtain from their patients. Indeed, Defendants, who receive, maintain, collect, and handle PII and PHI from their patients, were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

101.    Enzo breached the duties owed to Plaintiff and Class Members and was thus negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendants breached their duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging their system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time

22

thereafter; (g) failing to follow their own privacy policies and practices published to their patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

102.    But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

103.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

   a.    Theft of their PII and/or PHI;

   b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

   c.    Costs associated with purchasing credit monitoring and identity theft protection services;

   d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

   e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

   f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.   Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.   Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.   Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

104.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(Against All Defendants)**
**(Plaintiff on Behalf of the Class)**

105.   Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

106.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendants for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Enzo's duty.

107.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI its entrusted from their patients.

108.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

109.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

110.    Defendants are entities covered under the HIPAA, which sets minimum federal standards for privacy and security of PHI.

111.    Pursuant to HIPAA, 42 U.S.C. § 1302d, *e. seq.*, and its implementing regulations, Defendants had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class members' electronic PHI.

112.    Specifically, HIPAA required Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et seq*.

113.    Defendants violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI.

114. Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients of Defendants.

115. Defendants' violation of HIPAA constitutes negligence *per se*.

116. The harm that has occurred as a result of Defendants' conduct is the type of harm that the FTC Act and HIPAA were intended to guard against.

117. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

    a. Theft of their PII and/or PHI;

    b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c. Costs associated with purchasing credit monitoring and identity theft protection services;

    d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.    Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

118.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
**(Against All Defendants)**
**(Plaintiff on Behalf of the Class)**

119.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

120.    Plaintiff brings this claim individually and on behalf of the Class.

121.    When Plaintiff and members of the Class provided their PII and PHI to Defendants in exchange for clinical lab testing services, they entered into implied contracts with Defendants, under which Defendants agreed to take reasonable steps to protect Plaintiff's and Class Members'

PII and PHI, comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII and PHI, and to timely notify them in the event of a data breach.

122.    Defendants solicited and invited Plaintiff and Class Members to provide their PII and PHI as part of Defendants' provision of clinical lab testing services. Plaintiff and Class Members accepted Defendants' offers when they made and paid for purchases of Defendants' services and products and provided their PII and PHI to Defendants.

123.    When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with their statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and PHI and to timely notify them in the event of a data breach.

124.    Defendants' implied promise to safeguard patient PII and PHI is evidenced by, *e.g.*, the representations in Defendants" HIPAA Policy set forth above.

125.    Plaintiff and Class Members paid money to Defendants in order to receive healthcare services. Plaintiff and Class Members reasonably believed and expected that Defendants would use part of those funds to obtain adequate data security. Defendants failed to do so.

126.    Plaintiff and Class Members would not have provided their PII and PHI to Defendants had they known that Defendants would not safeguard their PII and PHI, as promised.

127.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendants.

128.    Defendants breached their implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII and PHI.

129. The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

a.     Theft of their PII and/or PHI;

b.     Costs associated with purchasing credit monitoring and identity theft protection services;

c.     Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

d.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.     The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.     Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.      Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.      Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

130.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Against All Defendants)**
**(Plaintiff on Behalf of the Class)**

131.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

132.    Plaintiff brings this claim individually and on behalf of the Class in the alternative to Plaintiff's Breach of Implied Contract claim.

133.    Upon information and belief, Defendants funds their data security measures entirely from their general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

134.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known only to Defendants.

135.    Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased healthcare services from Defendants and/or their agents and in so doing provided Defendants with their PII and PHI. In exchange, Plaintiff and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

136.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

137.    In particular, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security.

138.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by their common law and statutory duties.

139.    Defendants failed to secure Plaintiff and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

140.    Defendants acquired the PII and PHI through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

141.    If Plaintiff and Class Members knew that Defendants had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendants.

142.    Plaintiff and Class Members have no adequate remedy at law.

143.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have sustained injuries, including, but not limited to:

a.    Theft of their PII and/or PHI;

b.    Costs associated with purchasing credit monitoring and identity theft protection services;

c.    Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants

would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.    Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

144.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered damages and will continue to suffer other forms of injury and/or harm.

145.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(Against All Defendants)**
**(Plaintiff on Behalf of the Class)**

146.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

147.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

148.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Enzo is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Enzo's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and PHI and remains at imminent risk that further compromises of her PII and/or PHI will occur in the future.

149.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a.    Defendants owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and
>
> b.    Defendants breached and continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII and PHI.

150.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

151.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Enzo. The risk of another such breach is real, immediate, and substantial. If another breach at Enzo occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

152.     The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

153.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Enzo, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all other similarly situated, prays for relief as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.     For damages in an amount to be determined by the trier of fact;

D.     For an order of restitution and all other forms of equitable monetary relief;

E.     Declaratory and injunctive relief as described herein;

F.     Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G.     Awarding pre- and post-judgment interest on any amounts awarded; and

H.     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated:  June 26, 2023                    Respectfully submitted,


                                         /s/ Jeffrey J. Corrigan
                                         Jeffrey J. Corrigan (Bar I.D. No. 2372654)
                                         **SPECTOR ROSEMAN & KODROFF, P.C.**
                                         2001 Market Street, Suite 3420
                                         Philadelphia, PA  19103
                                         Telephone: (215) 496-0300
                                         Facsimile: (215) 496-6611
                                         jcorrigan@srkattorneys.com

                                         Gary F. Lynch*
                                         Nicholas A. Colella*
                                         **LYNCH CARPENTER LLP**
                                         1133 Penn Avenue, 5th Floor
                                         Pittsburgh, PA 15222
                                         Telephone: (412) 322-9243
                                         Facsimile: (412) 231-0246
                                         gary@lcllp.com
                                         nickc@lcllp.com

                                         Katrina Carroll*
                                         **LYNCH CARPENTER LLP**
                                         111 W. Washington St., Suite 1240
                                         Chicago IL 60602
                                         Telephone: (312) 750-1265
                                         katrina@lcllp.com

                                         Jonathan M. Jagher*
                                         **FREED KANNER LONDON & MILLEN LLC**
                                         923 Fayette Street
                                         Conshohocken, PA 19428
                                         Telephone: (610) 234-6486
                                         jjagher@fklmlaw.com

                                         *pro hac vice forthcoming